UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL ACTION NO. 1:21-CR-00018-GNS<br>*Filed Electronically* |
| FREDDY MANUEL GONZALEZ | DEFENDANT |

### UNITED STATES' SENTENCING MEMORANDUM

For the premeditated murder of B.R., the United States requests that the Court sentence defendant Freddy Manuel Gonzalez (Gonzalez) to 40 years of imprisonment, followed by five years of supervised release.

### FACTS

B.R. and M.R. were high school sweethearts who married and had two children.[1] After sixteen (16) years of marriage, in 2018 they separated and divorced, but continued to co-parent their children.

In February 2020, M.R. began dating Gonzalez. They dated for approximately eight months, but in October 2020 M.R. broke up with Gonzalez and began dating her ex-husband, B.R. Gonzalez continued to pine after M.R., and over the next couple months, M.R. alternated between dating Gonzalez and B.R., before breaking up with Gonzalez for the final time on or about December 15, 2020. (DN 142, PSR ¶¶ 10-11).

Between October and December 2020, when their relationship was in question, Gonzalez obsessively stalked M.R. He deluged her with text messages, surreptitiously placed a digital

---

[1] See Exhibit 1, photographs of B.R. and his children.

1

tracking device on her car, surveilled her, and staged "random" encounters with her. (Id. at ¶ 12). During that time, he also confronted B.R. at his Franklin, Kentucky home and demanded to know where M.R.'s whereabouts. (Id. at ¶ 15). Gonzalez also threatened B.R. and told him that he had a gun and would kill him, a threat B.R. took seriously and relayed to several of his co-workers. (Id. at ¶ 12).

Finally, in mid-December 2020, Gonzalez decided that the only way to get M.R. back was to eliminate the competition by murdering B.R. Gonzalez had told M.R. on numerous occasions that he did not believe he could prevail in a physical altercation with B.R., so Gonzalez decided to hire someone else to commit the murder.

Gonzalez operated a café at the Mint Gaming Hall at Kentucky Downs in Franklin, Kentucky, and co-defendant Xavier Caine Posey (Posey) was one of his employees. (Id. at ¶ 14). In December 2020, Gonzalez told Posey that he wanted B.R. to be murdered, and he offered to pay Posey to commit the murder.[2] Gonzalez specified that the murder had to occur before January 1 because B.R. and M.R. were scheduled to travel to Nashville together to celebrate the new year. (Id. at ¶ 16).

Gonzalez offered to pay Posey $2,000 to murder B.R., along with a pickup truck and a pay raise at the café. Gonzalez knew that Posey used illegal narcotics, and as a further inducement he falsely told Posey that B.R. was a drug dealer and that B.R. probably had marijuana and methamphetamine in his house. Posey agreed, and Gonzalez gave Posey a gun and ammunition to use to murder B.R.[3] (Id. at ¶¶ 17-18).

---

[2] Gonzalez had recently tried to recruit another person to commit the murder, but that person declined.
[3] Cell phone records reflect that on Christmas Eve, December 24, 2020, Gonzalez called six different gun stores and pawn shops.

In the back half of December, Gonzalez test drove a Chevrolet Silverado from B&L Auto Sales, and during the test drive he went to a Walmart and made a copy of the ignition key. Shortly thereafter, late at night after the business had closed, Gonzalez and Posey drove to B&L Auto Sales and Posey used the copied key to steal the Silverado truck.  (Id. at ¶ 19).

Around Christmas day, the Silverado truck was stolen from Posey, leaving Posey without transportation.  (Id. at ¶ 20).  On December 27 or 28, Gonzalez drove Posey close to B.R.'s Franklin residence on Portland Avenue and showed him a picture of B.R. taken from social media.  Gonzalez expressed his frustration that B.R. was still alive, and threatened to renege on the remainder of their deal and kill B.R. himself if Posey would not do the job quickly.  Posey reiterated his interest in murdering B.R. for payment, and Gonzalez gave Posey more ammunition and paid him between $300 and $400.  (Id. at ¶¶ 20-21).

On December 29, Gonzalez exchanged texts with M.R. to confirm that B.R. would be home alone that night:

> **Gonzalez**: Well, I'm sure u won't be texting me when u get home so have a goodnight [M.R.] unless u get away for a lil and want to message me.
>
> **M.R.**: Her won't be around me freddy so hush with that . . . dam
>
> \*   \*   \*
>
> **M.R.**: No . . . Im going grocery shopping, he's headed home, his home shall I say
>
> **Gonzalez**: Grocery shopping where let me guess he had ur car still
> **M.R.**: Food lion . . . win big, have fun
>
> **Gonzalez**: Ill try u still have his car
>
> **M.R.**: Yes I'll have mine 2moro
>
> \*   \*   \*

3

**Gonzalez**: Let me guess he is staying with u tonight as well huh. Since he didn't lastnight

\*   \*   \*

**Gonzalez**: I asked if he was staying with u tonight since he didn't lastnight

\*   \*   \*

**M.R.**: Nope he sure ain't

**Gonzalez**: So ur going home alone? Can we please talk cilcal

\*   \*   \*

**Gonzalez**: Its b cur not going to be there alone. U will block me bc he will be there.

**M.R.**: No he won't freddy!! Bet ur winnings from the other night he won't be!! Wanna take the bet? He has to come get his weed after he talks to his boss, but he not staying, bet!

**Gonzalez**: Ok.[4]

On December 29, Gonzalez also exchanged text messages with Posey in which the pair discussed "cleaning the kitchen," the code they had decided upon to conceal discussions about murdering B.R., and Gonzalez gave Posey the green light to pursue their murder agreement.

**Gonzalez**: Need to know something brother about the cleaning the

**Posey**: Just let me know ifu do or not

**Gonzalez**: U got me thinking man about this one lol. I don't

**Gonzalez**: The kitchen area really needs it tho

**Posey**: Right well it's up to u fam

**Gonzalez**: I would rather u do it man be I do trust that you ca

**Posey**: I got u

---

[4] See Exhibit 2, Cellebrite Extraction Report at 9-12.

      **Gonzalez**:  Alright awesome

(Id. at ¶¶ 17, 22).

      In the evening of December 29, Posey called his friend and fellow drug user, Andy Schmucker (Schmucker), and asked him for a ride.  Schmucker picked Posey up in Bowling Green in a Ford truck, and the pair drove to Franklin.  They drove around Simpson County for some time, talking while Posey smoked methamphetamine.  Posey eventually told Schmucker that he had been hired to kill someone, which Schmucker initially thought was a joke.  (Id. at ¶ 23).

      Around 5:30 am on December 30, Posey had Schmucker drive him to Greenlawn Cemetery, which abutted the back of B.R.'s property.  Posey got out of the truck and walked through the cemetery towards B.R.'s house until realizing that the brush was too thick and returning to the road, where Schmucker picked him up.  This activity was captured by neighborhood surveillance cameras.  When he returned to the truck, Posey offered Schmucker $1,000 to drive him to B.R.'s house.  Schmucker accepted and drove to Portland Avenue, parking across the street from B.R.'s house.  (Id. at ¶ 24).

      Posey, wearing a mask and gloves and carrying the gun Gonzalez provided, got out of the truck and walked across the street to B.R.'s home.  He knocked on the door and heard B.R. say "yeah" from inside.  Posey told B.R. that he had car trouble and needed jumper cables.  B.R. opened the door wearing a bathrobe.  Posey pointed the gun and, at point blank range, executed B.R. in his doorway, shooting him three times, once in the head and twice in the torso.  Posey then ran back to Schmucker's truck and they fled.  Schmucker asked Posey "if he got him" and Posey said he did not know.  (Id. at ¶¶ 25-26).

5

At 6:13 a.m. on December 30, the Franklin Police Department (FPD) received a report of shots fired on Portland Avenue. Upon arrival, the FPD discovered B.R., bloody and lying on his kitchen floor, conscious but sweating profusely and struggling to breath and begging for help.[5] B.R. was rushed to the emergency room at Franklin Medical Center and a detective tried to question B.R. about who shot him, but B.R. could only give the detective his own name. B.R. died shortly thereafter. B.R. was 43 years old, leaving behind his two children[6] and several other grieving family members. (Id., ¶¶ 27-29).

Later in the day on December 30, Gonzalez and Posey discussed the shooting in the following text exchange:

> **Posey**: Did I not clean it good enough?
>
> **Gonzalez**: I haven't heard from anyone it was cleaned be she
>
> **Gonzalez**: Did you clean the hoods up there?
>
> **Posey**: Definitely did but u can check when I get back to work

(Id., ¶ 31).

That same day, Gonzalez contacted the FPD and claimed that he was receiving threatening text messages related to B.R.'s murder, and claimed that M.R. had accused him of being involved in the murder. During an interview Gonzalez denied any involvement in the murder, although he acknowledged a relationship with M.R. (Id., ¶¶ 33-34).

One or two days after the murder, Gonzalez and Posey met at Gonzalez's house and disassembled the murder weapon and cleaned it with bleach. Gonzalez paid Posey between $200 or $300 more, and they drove to the banks of the Barren River and threw the gun parts toward the river. (Id., ¶ 36).

---

[5] See photographs of B.R., attached as Exhibit 3.
[6] At the time of his murder, B.R.'s son was 16, and his daughter was 13.

On January 4, 2021, the FPD searched M.R.'s car, which had been parked at B.R.'s house on the day of the murder. During the search, they discovered a tracking device underneath the steering wheel. When they removed and disabled the tracking device, Gonzalez immediately contacted the FPD and came in for a second interview. Gonzalez admitted that he had secretly installed the tracking device in mid-December, when M.R. broke up with him, to see if M.R. "was being faithful due to them having trust issues and her being distant." (Id., ¶¶ 37-38). Gonzalez was arrested for stalking on January 5, 2021, and a search warrant executed on his cell phone revealed the above-mentioned text messages with M.R. and Posey. On January 6, 2021, in a recorded prison call, Gonzalez told a third party that he needed her to do him a favor by reminding Posey that "all they talked about was cleaning the café." (Id., ¶¶ 39-40).[7]

On January 9, 2021, Posey was arrested on outstanding warrants. A search incident to arrest led to the discovery of a hand drawn map of the inside of M.R.'s home, along with M.R.'s address. (Id., ¶ 42). Posey later claimed that Gonzalez gave him the map so he could rob M.R. after B.R.'s murder, which Gonzalez believed would make M.R. more inclined to continue her relationship with Gonzalez.[8] (Id., ¶ 18).

Investigators discovered the following January 5, 2021 text exchange between Gonzalez and Posey, however, suggesting that after M.R. accused Gonzalez of involvement in B.R.'s murder, and M.R. refused to rekindle their relationship, Gonzalez and Posey may have discussed murdering her as well, and the map may be related to a second murder plot:

**Posey**: Ok, are we still going in for deep cleaning tomorro

**Gonzalez**: No I think we are going to just take the day off m

---

[7] Attached as Exhibit 4.
[8] Gonzalez has admitted that he drew the map, which is attached as Exhibit 5.

Gonzalez and Posey were both federally indicted in May 2021 on one count of murder for hire. On June 17, 2024, Gonzalez and Posey both pleaded guilty to a Superseding Information charging them with knowingly possessing a firearm in furtherance of murder for hire in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(j)(1). (Id. at ¶¶ 2, 6, and 8).

## SENTENCING RECOMMENDATION

### I.     The PSR Accurately Reflects Gonzalez's Offense Level and Criminal History

The Probation Officer calculated that Gonzalez has an offense level of 42 and a criminal history category I, resulting in a final recommended sentencing range of 360 months to life. (DN 142, ¶¶ 48-58, 98). The United States has no objection to this calculation.

Gonzalez objects to a two-level enhancement under § 3B1.1 for a leadership role, arguing that (1) because leadership is inherent in any murder-for-hire scheme, a leadership enhancement is categorically unavailable for a murder-for-hire defendant, and (2) the facts here do not support a leadership enhancement for Gonzalez. (DN 142-1 Addendum 767-74). Both arguments are unfounded.

First, several circuits have considered leadership enhancements in murder-for-hire schemes, sometimes affirming them and sometimes reversing them. United States v. Delpit, 94 F.3d 1134, 1156 (8th Cir. 1996) (remanding a role enhancement for a murder-for-hire offense based on the meaning of "participant"); United States v. Thibault-Lemke, 990 F.2d 1265 (9th Cir. 1993) (affirming a role enhancement for a murder-for-hire defendant who "helped recruit the would be killers[,] was responsible for providing transportation to them[, and] suggested methods by which the intended victim could be killed); United States v. Dota, 33 F.3d 1179, 1189 (9th Cir. 1994) (affirming a role enhancement for a murder-for-hire defendant); United

States v. Ellis, 789 F. App'x 163, 168 (11th Cir. 2019) (affirming a four-level role enhancement in a murder-for-hire plot). A leadership role is not, as Gonzalez claims, always part of "the inherent nature of the offense itself" (DN 142-1, Addendum, PageID# 767), but instead must be considered on the individual facts of individual cases. Also, as the Presentence Report notes, Gonzalez stands convicted of "Murder Through Use of a Firearm During a Crime of Violence" (DN 127, Superseding Information), a crime for which the Sixth Circuit affirmed this Court's application of a § 3B1.1 enhancement. United States v. Caballero-Melgar, No. 21-6036, 2023 WL 4864285, at *12 (6th Cir. July 31, 2023).

      Second, the specific facts here support a role enhancement for Gonzalez. In determining whether a defendant is an organizer or leader under § 3B1.1, this Court should consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. 3B1.1, cmt. n. 4.

      Here, Gonzalez recruited others: he first tried to recruit someone else, and—when that effort failed—successfully recruited Posey. Gonzalez intended to receive a larger share of the fruits of the crime, as his anticipated benefit from B.R.'s murder clearly surpassed the paltry sum he offered Posey to pull the trigger. Gonzalez also planned and organized the offense, providing the gun, ammunition, and desired timeframe. That organization and planning included ensuring the M.R. would not be in the house with B.R. on the night of the murder. Even after the murder, Gonzalez tried to instruct Posey how to explain their coded text messages if questioned by police.

Given all of these facts, Gonzalez's enhancement for a leadership role is well-supported and appropriate.

## II. A Forty-Year Sentence Is Necessary and Appropriate to Recognize the Seriousness of the Offense, and to Satisfy the 3553(a) Sentencing Factors

The United States recommends that Gonzalez be sentenced to forty (40) years of imprisonment for B.R.'s murder. A forty-year sentence will not bring B.R. back, and no sentence will ever be sufficient to ease his children's pain and suffering. But it will satisfy all of the Title 18, United States Code, Section 3553(a) sentencing factors, whereas any sentence below forty years, for a premeditated murder, would be insufficient. A sentence under forty years would also trivialize the value of B.R.'s life, minimize the violent and extreme conduct in this case, and frustrate, rather than promote respect for the law.

A forty-year sentence recognizes the nature and circumstances of this offense, a cold-blooded, calculated murder orchestrated by Gonzalez because he was angry that his girlfriend rejected him for B.R. A forty-year sentence, as opposed to life in prison as originally charged, recognizes Gonzalez's history and characteristics, including his military service. A forty-year sentence gives Gonzalez an opportunity to leave prison in his early 70s and enjoy his golden years as a free man, a luxury B.R. will never have. 18 U.S.C. § 3553(a)(1).

It is difficult to imagine a more serious offense than premeditated murder. A forty-year sentence will reflect the seriousness of Gonzalez's offense—the jealousy, the rage, the stalking, the callous planning, and the ruthless execution. It will promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2)(A).

A forty-year sentence, with no parole, will also afford adequate deterrence. 18 U.S.C. § 3553(a)(2)(B). If sentenced to 40 years, Gonzalez will be in his 70s when he is released. As such, given the recidivism data on elderly offenders, a forty-year sentence will likely protect the

public from his further crimes. 18 U.S.C. § 3553(a)(2)(C). Finally, a forty-year sentence is in the middle of the recommended Guideline range,[9] and will avoid unwarranted sentencing disparities with similarly situated defendants. 18 U.S.C. § 3553(a)(6).

The JSIN data provides only negligible value. (DN 142, ¶ 101). First, it utilizes a very limited sample size, creating a substantial risk that a couple outlier sentences and outlier fact patterns could dramatically distort the sentencing averages. Second, the JSIN data includes sentences for less serious crimes like felony murder, as opposed to the carefully planned and executed murder Gonzalez spearheaded in this case. Moreover, as Application Note 2(B) of section 2A1.1 of the Guidelines makes clear, "if the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted." That is clearly not the case here, but as a result, the small sample size JSIN data is very likely skewed by factually dissimilar cases.

Any sentence below forty years would also be contrary to section 5K2.1 of the Sentencing Guidelines, which, as noted by the Probation Officer, states that it is appropriate, under the proper circumstances, for the court to sentence above the recommended Guideline range where, as here, death resulted. See DN 142, ¶ 119. Specifically, the court is advised to "distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. . . . The extent of the increase should depend on . . . the extent to which death or serious injury was intended or knowingly risked."

Gonzalez's offense level was calculated under section 2A1.1 of the Sentencing Guidelines, which applies the same base offense level to a defendant convicted of premeditated murder as a defendant convicted of felony murder. The major difference between the two is that

---

[9] Assuming an average life span of about 85 years.

for the premeditated murderer, like Gonzalez, murder is the goal, the sole object of the crime. For the felony murder defendant, however, the objective was the underlying felony, but the murder just happened. It was unplanned.

It may, at times, be acceptable for an "accidental" felony murder defendant to be sentenced at the low end of the Sentencing Guidelines. Section 5K2.1 cautions that the same does not hold true for Gonzalez, the premeditated murderer, who:

a) Made a deliberate and conscious decision to murder B.R.,

b) developed a plan to murder B.R.,

c) recruited and paid Posey to murder B.R.,

d) utilized code words to discuss the murder,

e) provided the gun and ammunition to Posey,

f) helped steal a truck to pay Posey for the murder,

g) made sure B.R. was alone on the night of the murder, and

h) helped Posey cover-up and destroy evidence of the murder.

Gonzalez must be sentenced more harshly than a felony murderer, and a forty-year sentence recognizes Gonzalez's actions and the distinctions between the crimes.

Finally, in deciding Gonzalez's sentence, the United States asks the court to consider the words of B.R.'s children, as reflected in their Victim Impact Statements:

> **I.R.**: It affected my whole life ever since it happened. I lost my best friend from being my first baseball coach to putting up a basketball goal on the last Christmas that I got to spend with him. . . . I have lost myself and not been the same person since that day. I have lost myself and not been doing the things I wanna do or achieve in life because I can't stop thinking about that day. . . . I've been really depressed since that.
>
> **S.R.**: It hurt us, just knowing he's not here anymore hurts. He was the one to put a smile on everyone's face. He brought out sunshine

> in every way. Yes I do suffer. I need my dad, you know? He was so easy to talk to. Yes, I have thought of letting go just to see him again. I haven't got good sleep in a while. . . . I just miss my dad he was my everything. . . . School is hard without just knowing he can't see me graduate or play any sports anymore or just helping me with homework.

For all these reasons, the United States requests that the court sentence Gonzalez to forty years of imprisonment, followed by five years of supervised release.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney

*David Weiser*
David Weiser
Madison T. Sewell
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I certify that on October 31, 2024, this pleading was filed and served to defense counsel through the court's ECF system.

*David Weiser*
David Weiser
Assistant United States Attorney

13