UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

*ELECTRONICALLY FILED*

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| PLAINTIFF, | |
| v. | CRIMINAL ACTION NO. 1:21-CR-00018-GNS |
| FREDDY GONZALEZ, et al., | |
| DEFENDANTS. | |

**SENTENCING MEMORANDUM ON BEHALF OF FREDDY GONZALEZ**

Comes the Defendant, Freddy Gonzalez ("Freddy"), by and through counsel, Brian Butler and Michael Denbow, and hereby submits the following sentencing memorandum in support of a sentence of 25 years.

Freddy pled guilty to one count of possessing a firearm as part of a conspiracy to commit a murder-for-hire, which led to a death, in violation of 18 U.S.C. § 924(c)(1)(A) and 924(j)(1). The statutory penalty range for 18 U.S.C. § 924(c)(1)(A) and 924(j)(1) is no incarceration up to a statutory maximum penalty of Life imprisonment. The Presentence Investigation Report ("PSI") calculates Freddy's United States Sentencing Guideline ("Guidelines") range at 360 months (30 years) to Life, however, based upon our objection to the PSI calculation, we respectfully believe the Guideline range is actually 292–365 months (roughly 24.4 years to 30.5 years). The parties' binding plea agreement calls for a sentence of no less than 25 years to no more than 40 years.

Because a sentence of 25 years is sufficient, but not greater than necessary, it is the appropriate resolution of this case. A 25-year sentence accounts for the significance of this crime, but also adequately considers the mitigating factors that Freddy is a veteran with no

criminal history who made a terrible decision while in the midst of a mental health crisis, caused in part by his obsession with Miranda Russell.  Importantly, Freddy's requested sentence is consistent with both the average and median sentences for crimes such as this.

## OBJECTION TO THE PSI

Freddy's sentence should not include an enhancement for an aggravating role pursuant to U.S.S.G. 3B1.1(c).  DN 140.  Application of this enhancement is not appropriate because the conduct allegedly supporting an "aggravating role" is the conduct constituting the offense, and because Freddy was not a leader, and this offense did not involve the type of "enterprise" or "organization" contemplated by this enhancement.

While not binding on the Court, it is also worth noting that the government kindly conducted a reverse proffer with Freddy this past Spring.  The government advised Freddy that based upon their Guideline calculations, they also believed his Guideline range to be 292–365 months, which did not include a leadership enhancement.

**I.    Nothing justifies an aggravating role enhancement under § 3B1.1 other than the conduct constituting the offense itself.**

The PSI states that Freddy "hired another individual to kill a man in exchange for money and other inducements.  [Freddy] entered into a verbal agreement with another person to kill someone else; provided that person with a handgun to accomplish the killing; and gave that person information requisite to accomplish the task.  [Freddy] orchestrated and micromanaged the efforts of another person to kill someone; paid that person after the killing took place; and assisted in the disposal of the murder weapon.  The defendant organized, led, managed, or directed the activities of another criminally responsible person."  *Id.* ¶ 52.

This circuit has made clear that a defendant is not to be considered an organizer, leader, manager, or supervisor if the only conduct justifying that title is the inherent nature of the

2

offense itself.  For example, "'fronting' drugs is merely a variant of a traditional buyer-seller relationship and, by itself, does not establish a drug-supplier's leadership or organizational role." *United States v. Ward*, 37 F.3d 243, 248 (6th Cir. 1994) (citing *United States v. Possick*, 849 F.2d 332, 336 (8th Cir. 1988)); *see also United States v. McDonald*, 800 F. App'x 364, 367 (6th Cir. 2020).  To justify enhancement under § 3B1.1, it is necessary for the Government to provide evidence of control other than the basic conduct requisite for the offense.  *McDonald*, 800 F. App'x at 367–68; *United States v. Ward*, 37 F.3d at 248 (6th Cir. 1994) (evaluating whether evidence of a defendant's role in a drug operation was sufficient to establish supervisory relationships and thereby convict him of engaging in a continuing criminal enterprise); *see also United States v. Weaver*, 716 F.3d 439, 444 (7th Cir. 2013) (citing *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994); *United States v. Pagan*, 196 F.3d 884, 892 (7th Cir. 1999); *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994); *United States v. Brown*, 944 F.2d 1377, 1381 (7th Cir. 1991); *United States v. Thompson*, 944 F.2d 1331, 1349 (7th Cir. 1991)) ("Yet '[s]upplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase, for these things do not indicate that the person who does them has a greater degree of responsibility for putting together the drug operation or a particular deal than anyone else involved, including the customer.' Indeed, a borrower would not describe her loan officer as her 'manager' or 'supervisor' simply because the loan officer imposes a credit limit, dictates the interest rate and loan term, advertises for customers, and refuses to be available on weekends. In this sense, *Weaver* was no different than any other business that extends credit to customers: he encouraged behavior that would protect his investment and insure payment of the debt owed to him.").

In other words, the application of a sentencing enhancement for one's role must be based on conduct other than the offense itself, or conduct intrinsic to the offense.  This makes sense, as anything else would increase a defendant's sentence for conduct already considered in the base offense level.  *See United States v. Cameron*, 573 F.3d 179, 185–86 (4th Cir. 2009) ("Furthermore, *Cameron's* sentence already reflects his role in the counterfeiting operation through application of § 2B5.1(b)(2)(A) of the Sentencing Guidelines, which provides a two-level increase where a defendant manufactured or produced counterfeit obligations of the United States. The existence of this separate enhancement suggests that, at least in the context of counterfeiting operations, a defendant must exercise a leadership role beyond the manufacturing of counterfeit bills in order to be subject to the leadership enhancement."); *see also* U.S.S.G. § 3B1.3 (prohibiting application of enhancement for abuse of a position of public or private trust or use of a special skill if an abuse of trust or skill is included in the base offense level or specific offense characteristic, and prohibiting application of enhancement based on solely the use of a special skill in addition to aggravating role enhancement).

The only conduct discussed in the PSI allegedly evidencing Freddy's control or supervision over Posey is conduct inherent in the offense itself—Freddy's hiring of Posey to carry out the murder—and is thus already considered in the base offense level.  In the same way that drug trafficking requires a supplier and a buyer, a murder-for-hire requires a hirer and a hiree.  Freddy should not be considered a "leader," "organizer," or anything similar due to his level of participation as the "hirer," or Posey's involvement, because both were essential to, and necessary for, the offense.

II.     **The facts do not support enhancing Freddy's sentence for his aggravating role.**

"Ultimately, in applying the [aggravating role] enhancement, the court must conduct a practical inquiry and make a 'commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy.'"  *United States v. Jones*, 56 F.4th 455, 493 (7th Cir. 2022), *cert. denied sub nom. Owens v. United States*, 143 S. Ct. 1766, 215 L. Ed. 2d 659 (2023), *and cert. denied*, 144 S. Ct. 320, 217 L. Ed. 2d 149 (2023), *and cert. denied sub nom. O'Bannon v. United States*, 144 S. Ct. 572, 217 L. Ed. 2d 304 (2024) (citing *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018) (*quoting United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015))).  This kind of enhancement should be applied only where both the extensiveness of the criminal activity, combined with the defendant's role, justify it.  *See Cameron*, 573 F.3d at 185–86.

A.     **§ 3B1.1 was not intended to apply to offenses like this one.**

Put simply, this is not the type of crime contemplated by § 3B1.1.  The language of the guideline itself, and case law and commentary interpreting it, consistently refer to criminal "enterprises," "organizations," "hierarchies," or "otherwise extensive" criminal activities.  *See* U.S.S.G. § 3B1.1; *see, e.g.*, *United States v. Carroll*, 893 F.2d 1502, 1509 (6th Cir. 1990); *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018); *United States v. Weaver*, 716 F.3d 439, 441–44 (7th Cir. 2013).  This arrangement between Freddy and Posey is not a criminal organization with a hierarchy and extensive criminal activity.  Rather, Freddy hired Posey in a murder-for-hire plot.  This enhancement is plainly meant for larger schemes.  It is not

appropriately applied here, where the criminal activity was confined to one instance where Freddy hired Posey, and both individuals were necessary for the commission of the offense.

### B.      The facts of this case do not support a § 3B1.1 enhancement.

The facts of this case also do not support a finding that Freddy had an aggravating role. "Application note 4 provides that '[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.'" *United States v. Dalton*, 574 F. App'x 639, 650 (6th Cir. 2014) (*quoting* U.S.S.G. § 3B1.1 cmt. n.4.).

A suggestion to commit a crime is not enough to warrant a § 3B1.1 enhancement. U.S.S.G. § 3B1.1 cmt. n.4; *United States v. Pritchard*, 964 F.3d 513, 529 (6th Cir. 2020). Neither is a "one-off request from one equal to another." *Weaver*, 716 F.3d at 444 (citing *United States v. Figueroa*, 682 F.3d 694, 697–98 (7th Cir. 2012)) ("Because to be a 'manager' or 'supervisor' is to occupy a role—to have a status—cases distinguish between ongoing supervision and merely asking a coconspirator on one occasion to do something."). And again, "[s]upplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase, for these things do not indicate that the person who does them has a greater degree of responsibility for putting together the drug operation or a particular deal than anyone else involved, including the customer." *Id.* (citations omitted).

Applying the factors in Application Note 4 illustrates why Freddy should not receive an aggravating role enhancement. Freddy did not have "decision making authority" other than that which was intrinsic to and essential for him hiring Posey to commit the murder. Freddy's

participation in the crime was as the hirer.  Freddy provided the necessary information and a weapon to allow Posey to complete the murder-for-hire plot.  Again, this is intrinsic to the crime, but does not constitute leadership.

Beyond that, Posey decided how to complete the murder-for-hire.  Freddy did not hire or recruit any accomplices, including Schmucker.  Nor did he "micromanage" Posey, as indicated in paragraph 52 of the PSI.  DN 140.  Indeed, the facts show that Posey had near total independence from Freddy in carrying out this offense.  It was Posey who chose to include Schmucker to participate in the crime without the knowledge of Freddy.  The same is true for Posey's other recruit mentioned in paragraph 20 of the PSI.  *Id.*  It was Posey who autonomously decided to ask Schmucker to drive him to Brian Russell's house.  It is clear that Freddy did not orchestrate that arrangement, had no knowledge of it, had never met Schmucker, and certainly did not have any authority over him.  In fact, Schmucker's participation, without Freddy being notified and approving of his participation in the murder-for-hire plot, is strong evidence that Freddy was not exercising *any* supervisory authority.  Posey bolstered that even further in his statement to the government, when he explained that he alone decided to hire a driver based on his expectation of how he would carry out the offense, that he practiced shooting the gun to be used in the offense without Freddy present, and that he even *gave Freddy* instruction, such as to bring him more ammo, and to be at home with his phone when the offense was committed.

Neither was Freddy entitled to a larger share of the fruits of the crime.  Unlike in a classic drug conspiracy case where the supplier would typically get a higher percentage of the profit than would the drug mules, this case involves a classic buyer-seller relationship.  Freddy hired Posey to complete a task, Posey completed the task, and neither party received a disproportionate

share of the results.  This particular factor further demonstrates why an aggravating role is inappropriate.

Additionally, there was very little planning to complete this murder-for-hire.  Freddy had previously shown Posey where Brian Russell lived, showed Posey a picture of Brian Russell, and offered to pay Posey to kill Brian Russell.  As such, there was literally no planning beyond that which was absolutely essential for a murder-for-hire plot (i.e. who to kill and where to find them).

The nature and scope of the illegal activity further mitigates against applying an aggravating role enhancement.  While murder-for-hire is obviously a very serious crime, the scope of this crime was quite limited.  Freddy hired Posey to complete a one-time task—this was not an ongoing criminal enterprise.

Freddy also exercised no control over Posey beyond the fact that Posey would not be compensated if he did not complete the task.  This was a mere quid-pro-quo arrangement.  The texts between Posey and Freddy the night of December 29, 2020, further demonstrate that Posey and Freddy did not have a supervisor/subordinate relationship.  Freddy told Posey, "Its up to you," and said that he would "*rather* [Posey] do it."  DN 140, ¶ 22 (emphasis added).  Posey similarly told Freddy, "it's up to u" and then "I got u."  *Id.*  These texts do not show a relationship wherein Freddy could demand or require Posey to commit the offense, nor do they show a relationship wherein Freddy would punish Posey for failing to carry out the offense.  Instead, they establish  the hirer-hiree relationship between the two, which precludes the aggravating role enhancement for the reasons detailed above.

In conclusion, Freddy's hiring Posey was the type of one-off request that does not justify a § 3B1.1 enhancement.  Freddy did not continuously supervise Posey or provide the kind of

oversight required for application of this enhancement, nor were the two engaged in any other similar offenses together to indicate that this was some "enterprise" for the two.  To enhance Freddy's sentence for an aggravating role here would essentially mean every hirer in a murder-for-hire plot would receive an aggravating role enhancement, which is contrary to the criteria in Application Note 4 and would render § 3B1.1 meaningless in this context.  As such, an enhancement under § 3B1.1 is inappropriate and should not be applied to Freddy's sentence.

### C.     The Rule of Lenity opposes application of § 3B1.1.

The Addendum to the PSI kindly notes that the above objection was "well-articulated." In deciding not to alter the PSI and continue to include an aggravating role enhancement, United States Probation equates the objection to double-counting pursuant to Guideline § 1B1.1, comment n.4(B).  Importantly, the PSI Addendum notes that permissible double-counting "may apply."  That it "may apply" does not support adding an enhancement, particularly when that enhancement increases the low end of the Guidelines sentencing range by over 5 years.  If an ambiguity exists in the application of a Guideline, the rule of lenity applies in favor of the defendant.  *See United States v. Boucha*, 236 F.3d 768, 776 (6th Cir. 2001) (citing *Chapman v. United States,* 500 U.S. 453, 463 (1991)).

As such, Freddy respectfully requests that the Court sustain this objection to the application of an enhancement under § 3B1.1, thereby reducing the Final Offense Level to 40, with a corresponding Guideline sentencing range of 292–365 months.  For convenience, Freddy provides the following chart to illustrate the differences between the Guidelines calculations recommended by United States Probation and the Guidelines calculations he believes are correct.

| Guideline | Probation | Freddy |
|---|---|---|
| Base Offense Level<br><br>U.S.S.G. § 2A1.1(a) | 43 | 43 |
| Role Adjustment<br>U.S.S.G. § 3B1.1 | +2 | 0 |
| **Adjusted Offense Level** | 45 | 43 |
| Acceptance of Responsibility<br>U.S.S.G. § 3E1.1 | -3 | -3 |
| **FINAL OFFENSE LEVEL** | 42 | 40 |
| **GUIDELINE RANGE** | 360-Life<br>(30 years to Life) | 292-365<br>(approximately 24.4 years to 30.5 years) |

## APPLICATION OF THE 18 U.S.C. § 3553 FACTORS

Consideration of the factors outlined in 18 U.S.C. § 3553 further demonstrates why a sentence of 25 years is sufficient, but not greater than necessary.

### I.      Background

Freddy's life has been one of service to his children, his parents, and his country.  In each role, he exhibited the same good nature and compassion for others that he is known for.  Unfortunately, this also led to significant mental health struggles, which, regretfully, eventually overshadowed reason.  He now faces a very significant sentence of incarceration as a result.

### A.      Personal Life

As the PSI details, Freddy had a difficult childhood.  His family lived in poverty and conflict.  *See* DN 140, ¶ 72.  His father was a "violent drunk," and he suffered sexual abuse by a

10

family acquaintance for several years.  *See id.* at ¶¶ 72, 73.  Despite this, Freddy has still exhibited service and compassion in his personal life.  For example, he helps his family out whenever he can.  **Exhibit A**, *Pat & Ramon Letters*.  Prior to his offense, he served as the primary caregiver for his parents.  This included assisting his father, who now suffers from dementia.  DN 140, ¶ 70.

Freddy is a friend to everyone and a contributing member to his community.  **Ex. A**; **Exhibit B**, *Kim Serrano Letter.*  Those who know him attest that he would help anyone in need, and that he gets along with those he meets because he treats them with love and respect.  **Ex. A**; **Ex. B.**  Freddy's military evaluations from his time with the National Guard also evidence his "selfless service,"  such as him "assist[ing] a family out of a burning home."  *See* **Exhibit C**, p. 14.

Most importantly, while never married, Freddy has two children, A.R. and J.R., from two previous long-term relationships.  As a single father, Freddy was devoted to A.R. and J.R.  **Ex. A**; *see also* **Exhibit D**, *Roxie Hatler Letter*.  Freddy remained consistently employed, often taking on several different jobs, to provide for them.  In addition to his service with the National Guard, Freddy obtained his Commercial Driver's License in 2006, and worked in trucking, waste management, and recycling, until eventually becoming a school bus driver in 2019.  A.R., following in Freddy's footsteps, has enlisted in the military.  J.R. has plans to attend college and become a veterinarian.

### B.    Military Service

As indicated above, Freddy enlisted in the Army National Guard at just 24 years old. After a 13-year career, he was honorably discharged from the 101st Division in March 2021. **Exhibit E.**  His career had taken him across the country—to Arkansas, South Carolina, and

Maryland—and even internationally, to Kuwait and Iraq, a "designated imminent danger area," where he served as gate security in 2011. *See* **Exhibit F.** By the time of his discharge, he had worked his way to the rank of E-07, Sergeant First Class. **Ex. E.**

Freddy worked hard during his time in the National Guard. His evaluations explain that he "constantly [sought] and accept[ed] additional responsibilities above his pay grade," "constantly sought self improvement," "performed exceptionally when place[d] in difficult situations," and accomplished the tasks assigned to him. **Ex. C**, p. 4, 14. He "capitalized on every opportunity to attend military schools"—he obtained his GED while in the National Guard, and was awarded a Certificate of Achievement. *See id.* at 10; **Exhibit G**; **Exhibit H.** Before he attained his rank of E-07, he was described as a hardworking and "forward[-]thinking E-6 who filled the role of[,]" and was "trusted to fulfill the role of" an E-07. **Ex. C**, p. 4. Freddy consistently met all of the National Guard's values and went above and beyond in many ways. *See generally id.*

Freddy served in the military, and he served those he served with. His evaluations evidence that, throughout his military career, he consistently acted as a servant leader who "led by example;" fostered a positive and inclusive climate for soldiers; ensured people were treated equally and fairly; volunteered his personal time to better himself and his team; had a "team first mentality;" and accepted responsibility for his actions, as well as his soldiers' actions, regardless of whether those actions were "good, bad, right, or wrong." *Id.* Freddy's compassion for others also enabled him to see worth in those he served with: he valued his subordinates' experience and knowledge, recognizing what they brought to the team, and gave "100% loyalty and support to the chain of command." *Id.* at 8, 20.

His leadership skills and work ethic are just a few of his admirable traits recognized in his evaluations.  His leaders also recognized that he displayed "unquestionable integrity," commitment, respect, and mature and sound judgment.  *See generally id.*; *id.* at 16, 2, 4, 11, 18. Freddy was described as resilient, able to adapt to changing situations, and showing courage when faced with adversity.  *Id.* at 8, 10, 19.  These contributions earned Freddy several awards during his career.  He achieved an Army Commendation Medal, National Defense Service Medal, Global War on Terrorism Service Medal, Army Service Ribbon, Overseas Service Ribbon, Armed Forces Reserve Medal, and Iraq Campaign Medal.  **Ex. F.**

### C.    2020 to Present

Freddy met and began dating Miranda Russell, Brian Russell's ex-wife, in early 2020. While he and Miranda were dating, Freddy was offered the opportunity to own and run a café in The Mint Gaming Hall in Franklin, Kentucky, which was previously owned by his sister Stephanie's partner.  Having previously felt somewhat limited in his career options by his desire to remain available for any and all assignments offered to him by the National Guard, Freddy was excited by the prospect of running his own business, and the freedom that came with entrepreneurship.  After several failed relationships and ill-fitting jobs, Freddy felt he was finally hitting his stride: he was coming into an exciting new role owning his own business, and was able to share that excitement with Miranda.

Unfortunately, in the fall of 2020, Freddy began to struggle greatly with parenting his children, who were both in rebellious phases for which single parenthood felt like no match.  He was also singlehandedly fixing and cleaning his parents' home, which had become bug-infested. These responsibilities piled up all while Freddy was newly managing the café.  The typical stresses of employees, payroll, expenses, and revenue (or lack thereof) that came with running a

business were enough on their own, but they were exacerbated for Freddy by the threat and pressure that COVID-19 shut-downs brought.

Then, suddenly, in October of 2020, Miranda ended their relationship to resume one with Brian Russell.  Freddy was already overcome by the pressures he faced, but when coupled with the loss of his partner in Miranda with whom he was deeply in love, he found himself at a new low.  Freddy began to struggle severely with his mental health—the parental and sexual abuse he suffered in his childhood had left him particularly susceptible to abandonment issues.  He was seeing a counselor, but he unfortunately became so depressed that he contemplated, and eventually attempted, ending his own life.  His sister Stephanie confiscated his gun to keep him safe from himself.

Things began to improve somewhat when Miranda reconsidered her decision to end their relationship just a few weeks later, in early November.  Money was still tight—even more so due to the café experiencing a lengthy COVID-19 shut-down—and his children were still difficult to manage, but Freddy at least had a companion again.  Miranda and Freddy's relationship became serious very quickly.  The two went on a vacation to Chattanooga, Tennessee with Miranda's children, discussed marriage, looked at rings together, and began living together.

It was also around this time that Xavior Posey had begun working in the café with Freddy.  Posey was the nephew of a woman who was already working for Freddy.  Posey needed a job, and Freddy kindly extended him the opportunity of one.  Posey and Freddy got along well, even riding to work together some days.  Having kept to himself most of his life, Freddy enjoyed having a friend to talk to.

Out of the blue, in the middle of December 2020, Freddy began to sense that Miranda was pulling away again, and that Brian Russell was the cause.  In an act of desperation, Freddy

put a tracking device on Miranda's car to determine if she was indeed seeing her ex-husband again.  Shortly thereafter, Miranda again ended their relationship.

Freddy was able to see via the tracking device, before and in the days after Miranda ended their relationship, that Miranda was frequently with Brian Russell and staying at his home. But, adding insult to injury, Miranda continued to deny that she was seeing Brian Russell. Christmas was nearing, and as the gifts Freddy struggled to buy for Miranda and her children arrived on his doorstep, Freddy was alone, and Miranda was with Brian Russell.

Freddy found himself at a new low.  Having never truly resolved his mental health issues, he instantly reverted to the same overwhelming depression he experienced with their first break-up.  He was again threatening suicide, and his instability began to alter his perception of reality: he was begging Miranda to reconsider her decision, compulsively contacting her, and had convinced himself that he could fight for her and change her mind.  Freddy came to believe the only way to overcome his despair was to be with Miranda.  As one would expect of friends, he discussed this with Posey.  Eventually, he became so desperate to accomplish that, he tragically hired Posey to kill Brian Russell.

## II.    Argument

The overarching mandate of 18 U.S.C. § 3553(a) and the Guidelines is that courts structure a sentence that is "sufficient, but not greater than necessary."  Applying the sentencing factors set forth in 18 U.S.C. § 3553(a), Freddy respectfully requests a sentence of 25 years, which is both severe and sufficient, but not greater than necessary.

### A.    The nature and circumstances of the offense and the history and characteristics of the defendant.

18 U.S.C. § 3553 first states that a court shall consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant, when determining a

sentence.  Freddy has pled guilty to committing a serious offense, the seriousness of which is reflected in the Guidelines.  But, because the punishment should fit the offender, not just the crime, *United States v. Musgrave*, 647 Fed. Appx. 529, 533 (6th Cir. 2016) (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)), the Guidelines are not end of the inquiry.

Here, a sentence at the lower end of the plea agreement's range is warranted and appropriate because Freddy's offense is entirely inconsistent with the character he has exhibited his entire life.  Freddy is a law-abiding citizen who has demonstrated integrity and sound judgment.  He is a family man, who is and has always been dedicated to his children and his parents, working hard to care for them, and tackling taxing jobs to do so.  He not only served a 13-year career with the National Guard, but he went the extra mile each year of his career to lead his teams to success.  He further contributed to society through his time as a small business owner, and in the acts of kindness he did for others without second thought—some small, and some as valiant as saving a family from a burning building.

Nothing about Freddy's participation in this offense comports with who he has otherwise been because Freddy was not himself at the time.  His prior attempt to take his own life is evidence enough of the extremely poor mental health he was suffering from in late 2020.  He had been on the brink of a mental collapse for several months and, while he made attempts at doing so through counseling, he had never truly resolved the problem.  Instead, his relationship with Miranda served as somewhat of a temporary patch.

As the year progressed, his responsibilities grew and his personal circumstances worsened, putting even more of a strain on his mental health.  Miranda ending their relationship for a second time was the proverbial straw that broke the camel's back.  Freddy had nothing to

16

distract him from his internal and external struggles, and he began to act rashly and extremely as a result of that.

To be sure, Freddy had experienced the end of serious relationships previously, including with Miranda herself, and had never attempted to commit a similar offense against someone because of it.  This supports that the instant offense had far more to do with Freddy's unbalanced mental state at the time than it did with who he is as a person.  Freddy was simply too consumed by his depression, and related suicidal ideations and anger, to consider the reality and gravity of his actions.

The circumstances surrounding the offense further illustrate this, as well.  Freddy and Miranda met in the same calendar year that he and Posey committed the offense.  Brian Russell was shot within days of Miranda breaking up with Freddy, and Posey and Freddy came to their final agreement to commit the offense mere hours before its occurrence.  In other words, Freddy hired Posey while spiraling, and Posey took action before Freddy could reconsider his request.

Even still, glimpses of Freddy's true character did shine through.  The affidavit accompanying the criminal complaint shows that Freddy was wavering and uncertain about harming Brian Russell at all.  DN 1-1, p. 2.  When discussing the offense with Posey, he expressed hesitation.  *Id.*  He said he was simply "thinking about it," and left the ultimate decision up to Posey.  *Id.*  Freddy had to put the ball in someone else's court, likely to dissociate from the reality of it all.

Freddy now must face that reality.  He not only recognizes the gravity of his offense, he has accepted responsibility for it.  His request for a sentence at the low end of the plea agreement's potential range is based on the belief that the court should consider, in conjunction

with the offense, the benefit he has been to society previously, and his mental state at the time of the offense.

**B.      The need for the sentence imposed to achieve certain goals.**

The sentence requested by Freddy already aligns with sentences imposed for other defendants across the nation who were sentenced under the same guideline.  In addition to his personal characteristics, Freddy's lack of a criminal history and acceptance of responsibility make this sentence even more appropriate.

**1.      The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense.**

A sentence of 25 years' imprisonment falls squarely within the range of sentences often imposed under the same guideline applicable here, U.S.S.G. § 2A1.1.  The PSI provides that "[d]uring the last five fiscal years[,]" "defendants whose primary guideline was USSG §2A1.1, with a Final Offense Level of 42 and a Criminal History Category of I," excluding those who received a substantial assistance departure, received an average sentence of 301 months' (approximately 25 years) imprisonment, and a median sentence of 324 months' (27 years) imprisonment.  DN 140, ¶ 101.  The United States Sentencing Commission's ("USSC") Interactive Data Analyzer also includes 338 cases reported to the USSC for Fiscal Year 2023 in which the defendant was sentenced under U.S.S.G. § 2A1.1.  United States Sentencing Commission, *Interactive Data Analyzer*, *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited October 28, 2024).  29.3% of these defendants proceeded to trial, whereas 70.7% pled guilty.  *Id.*

While the USSC does not release identifying or case-specific information about the defendants included in these statistics, the distribution of sentence lengths for these defendants is telling.  Of these defendants, 29.6%—almost precisely the percentage of defendants that

proceeded to trial—received a sentence of life imprisonment.  *Id.*  On the other hand, 43.3% of

the defendants received between 10 and 30-year sentences.  *Id.*  About 10% of the defendants

received as little as 2 to 10 years.  *Id.*



The numbers for defendants sentenced under U.S.S.G. § 2A1.1 who were in criminal

history category I, like Freddy, provide more support for Freddy's request for a 25-year sentence.

Of the 106 defendants within this category, 26.4% of these defendants tried their case, with

73.6% pleading guilty.  *Id.*  Again, almost the exact same percentage of defendants who tried

their case, 27.4%, received life imprisonment.  *Id.*  11.3% of the defendants were sentenced to 2

to 10 years, and more of the defendants were sentenced to a term between 10 and 30 years when

compared to the defendants in all criminal history categories.  *Id.*  48.1% of the defendants—

almost half—received a sentence within the latter range.  *Id.*  Other than the portion of

defendants receiving life imprisonment, which likely almost completely overlaps with the

defendants proceeding to trial, the sentence ranges with the largest percentages of defendants

19

within them are the 10 to 15-year sentence ranges, and the 20 to 25-year sentence ranges. *Id.*

Both ranges are lower than what Freddy seeks here.



This data supports the conclusion that those who accept responsibility for their actions, even when sentenced under this guideline, often receive sentences similar to that which Freddy requests. It also supports that defendants within criminal history category I who accept responsibility, like Freddy, receive sentences that are even lower. Indeed, removing the defendants sentenced to life imprisonment, the sentence Freddy requests is at the higher end of what most of these defendants received. Thus, even without considering Freddy's personal history, a sentence of 25 years' imprisonment is entirely appropriate and would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

2.      **The need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from further crimes by the defendant.**

Prior to this offense, Freddy benefitted society and his community.  This isolated incident does not mean that he is now a threat to them.  As explained, his offense was the unfortunate result of a combination of poor mental health and life circumstances, and similar conduct in the future, while already unlikely given who Freddy is, would certainly be deterred by a sentence of 25 years' imprisonment.

Studies support this, too.  Multiple recidivism studies conducted by the USSC evidence that Freddy's age and criminal history category are correlated with low recidivism and reincarceration rates.  If incarcerated for 25 years, Freddy will be in his early 60s at the time of his release.

"Separately, age and criminal history are consistent predictors of recidivism."  United States Sentencing Comm'n, *Recidivism of Federal Offenders Released in 2010*, p. 29 (September 2021), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf.  In an analysis of 32,135 violent and non-violent offenders released in 2010, only 30.8% of offenders aged 50 through 59 at release were rearrested.  *Id.* at 24–25.  And, regardless of age, less than one-third of offenders in criminal history category I were rearrested.  *Id.* at 26.  In just the next highest category, criminal history category II, almost half of the offenders were rearrested.  *Id.*

"The combined impact of age and criminal history on recidivism is more pronounced."  *Id.* at 24.  In the same study, of the offenders in criminal history category I, those aged 50 through 59 at release were rearrested at a rate of 15%.  *Id.* at 30.  Another study found similarly—offenders in criminal history category I had low rearrest rates of 33.8% regardless of age, but within that category, recidivism rates decreased dramatically with age.  United States

Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, p. 8–10 (March 2017), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.  Within criminal history category I, offenders between ages 51 and 60 years old at release had the lowest rearrest rates.  *Id.*  This same study also found that even within criminal history category I, rearrest rates decreased dramatically, regardless of age, between offenders with one criminal history point and those with zero criminal history points, like Freddy.  *Id.* at 7.

This correlation does not change with violent offenders.  A third study found that, regardless of criminal history category, "[t]he majority of violent instant offenders younger than age 30 were rearrested and [only] approximately one-quarter (26.9%) of violent instant offenders aged 60 years and older were rearrested."  *See* United States Sentencing Comm'n, *Recidivism of Federal Violent Offenders Released in 2010*, p. 48 (February 2022), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220210_Recidivism-Violence.pdf.  Further, the overall rearrest rate for all of the violent offenders in criminal history category I, without considering the impact of age, was less than half.  *Id.* at 51.  Also noteworthy from this same study was that, of the offenders within criminal history category I, those sentenced to 10 years or more were rearrested at a rate of 34.2%, down twelve percentage points from offenders sentenced to 5 to 10 years.  *Id.* at 55.

Freddy's age and criminal history are objective factors that significantly reduce his likelihood for recidivism.  While Freddy's past character and service to society suggest he is not likely to reoffend, these objective measurements support that conclusion, as well.  Further, while

Freddy is asking for a sentence at the lower end of what the plea agreement considers, that sentence is well over the 10 year threshold that makes recidivism even more unlikely.

> **3.     The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Freddy would benefit from counseling, something he has and can participate in outside of incarceration.  He is educated and does not require specific medical care.  Any needs Freddy has could surely be met within his requested sentence, and his continued imprisonment after that time would arguably be contrary to this § 3553(a) factor, as he might be consuming resources more necessary and beneficial for other incarcerated offenders.

> **C.     The kinds of sentences available, the applicable sentence set out in the Guidelines, and the need to avoid unwarranted sentence disparities among similarly situated defendants.**

The plea agreement contemplates a potential sentence of 25 to 40 years' incarceration. Freddy is requesting a sentence of 25 years, which is at the lower end of that potential range.  As mentioned above, though the PSI calculates Freddy's Guideline range as 360 months, or 30 years, to Life, it also recognizes that "[d]uring the last five fiscal years[,]" "defendants whose primary guideline was USSG §2A1.1, with a Final Offense Level of 42 and a Criminal History Category of I," excluding those who received a substantial assistance departure, received an average sentence of 301 months' imprisonment (roughly 25 years), and a median sentence of 324 months' imprisonment (27 years).  DN 140, ¶ 101.  Also as explained above, this average of 25 years is consistent with what most defendants sentenced under this guideline received in FY2023, according to the USSC's Interactive Data Analyzer, and especially so for defendants who shared Freddy's criminal history category of I.

Freddy again respectfully submits that, as explained in the above objection to the PSI, his Final Offense Level under the Guidelines is more appropriately 40, which has a corresponding

sentencing range of 292–365 months, or 24.4 years to 30.5 years.  Importantly, defendants with the same criteria as those assessed in the PSI (sentenced under a primary guideline of §2A1.1 during the last five fiscal years, with a criminal history category of I, and without a substantial assistance departure) who had a Final Offense Level of 40—the same Final Offense Level that Freddy would have without an enhancement for an aggravating role—received an average sentence of 260 months' imprisonment (21.6 years) and a median sentence of 240 months' (20 years) imprisonment.  *See* United States Sentencing Commission, *Judiciary Sentencing Information*, *available at* https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited October 28, 2024).

These statistics are especially helpful for determining Freddy's sentence, because every sentencing under guideline § 2A1.1 involves a serious offense wherein something traumatic occurs, and someone is harmed.  Thus, while this offense shares those attributes, a sentence of 25 years is consistent with the sentencing practices employed against defendants similarly situated to Freddy who have committed similar offenses, and is therefore sufficient, but not greater than necessary.

## CONCLUSION

A 25-year sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing here.  When Freddy's sentencing range is calculated under the Guidelines without an enhancement for an aggravating role, his requested sentence is well within the Guidelines range.  Because a 25-year sentence of imprisonment is also within the range permitted by the plea agreement, and consideration of the § 3553 factors warrants a sentence at the lower end of the plea agreement's range, this sentence is sufficient, but not greater than

necessary.  Accordingly, Freddy respectfully requests this Court sentence him to 25 years' imprisonment.

*/s/Brian Butler* _____

Brian Butler
Michael Denbow
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202-3352
Telephone:  (502) 587-3400
bbutler@stites.com
mdenbow@stites.com

*Counsel for Defendant, Freddy Gonzalez*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all parties of record.

*/s/Brian Butler* _____
Counsel for Defendant, Freddy Gonzalez